## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

SHARON MELISSA VIA,      *
                                *

       **Plaintiff,**         *
                                *

-vs-                     *CIVIL ACTION NO. CV-06-**1242**
                                *

ALLSTATE INDEMNITY COMPANY    *
SHERRY OERTEL, DAVID OLETSKI,    *
                                *

       **Defendants.**      *
                                *

### CIVIL SUMMONS

SERVICE BY CERTIFIED MAIL IS HEREBY REQUESTED BY THE PLAINTIFF UPON THE FOLLOWING DEFENDANT:

> **Allstate Indemnity Corporation**
> **c/o The Corporation Company**
> **2000 Interstate Park, Suite 204**
> **Montgomery, Alabama 36109**

The Complaint which is attached to this Summons is important and you must take immediate action to protect your rights. You or your attorney are required to mail or hand deliver a copy of a written answer, either admitting or denying each allegation in the Complaint to the Plaintiff's Attorney.

> **CHRISTINA D. CROW**
> **LYNN W. JINKS, III**
> **JINKS, DANIEL & CROW, P.C.**
> **POST OFFICE BOX 350**
> **UNION SPRINGS, ALABAMA 36089**
> **(334) 738-4225**

The Answer must be mailed or delivered within 30 days after this Summons and Complaint were delivered to you or a judgment by default may be entered against you for the money or other things demanded in this Complaint. You must also file the original of your Answer with the Clerk of this Court.

FILED IN CIRCUIT COURT OF MONTGOMERY COUNTY 2006 MAY -4 AM 10:42

_____05/15/06_____     *Melissa Rittenaw*   By: *dk*
DATE                       CLERK OF COURT

# EXHIBIT _A_

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

SHARON MELISSA VIA individually &ast;
and as mother and next friend of Aiken &ast;
Hamlett, a minor, &ast;
    &ast;
    Plaintiff, &ast;
    &ast;
-vs- &ast;CIVIL   ACTION   NO.   CV-06- 1242
    &ast;
ALLSTATE INDEMNITY COMPANY &ast;
SHELLEY OERTEL, DAVID OLETSKI,&ast;
fictitious defendants A, B, C, D, and E, &ast;
being those persons, companies, &ast;
partnerships, or other entities who caused &ast;
or contributed to cause the injuries and &ast;
damages alleged herein through their &ast;
negligent and/or intentional conduct &ast;
and/or who are the successors in interest &ast;
to any of the named Defendants and/or &ast;
who had supervisory control or the duty &ast;
to supervise any of the named Defendants &ast;
and F, G, H, I and J, said fictitious &ast;
defendants being those corporations, &ast;
partnerships, other business entities or &ast;
other individuals who conspired with the &ast;
named Defendants to further the conduct &ast;
described in the complaint and/or who &ast;
acted either independently or participated&ast;
with others to commit the wrongful &ast;
conduct complained of herein, whose &ast;
name or names are unknown to the &ast;
Plaintiff at this time but which will be &ast;
substituted by amendment when &ast;
ascertained, &ast;
    &ast;
    Defendants. &ast;

2006 MAY -4  AM 10:42
FILED
CIRCUIT COURT OF
MONTGOMERY COUNTY

## COMPLAINT

### STATEMENT OF THE PARTIES

1

1.    Plaintiff Sharon Melissa Via is an adult resident citizens of Montgomery County, Alabama. She brings this case individually and as mother and next friend of Aiken Hamlett, a minor.

2.    Defendant Allstate Indemnity Company (hereinafter referred to as "Allstate") is a foreign corporation doing business in Montgomery County, Alabama.

3.    Defendant Shelley Oertel is an adult resident citizen of Mobile County, Alabama whose address for service is 18940 South 6th Street, Citronelle, Alabama 36522. At all times pertinent hereto, Defendant Oertel was doing business in Montgomery County, Alabama and was acting as an agent or principal of the other named Defendants.

4.    Defendant David Oletski is an adult resident citizen of Cook County, Illinios whose address for service is 51 West Higgins Road, Suite T1C, South Barrington, IL 60010-9300. At all times pertinent hereto, Defendant Oletski was doing business in Montgomery County, Alabama and was acting as an agent or principal of the other named Defendants.

5.    Fictitious defendants A, B, C, D, and E are those persons, companies, partnerships, or other entities who caused or contributed to cause the injuries and damages alleged herein through their negligent and/or intentional conduct and/or who are the successors in interest to any of the named Defendants, and/or who had supervisory control or the duty to supervise any of the named Defendants whose names are not known to the Plaintiff at this time but which will be substituted by amendment when ascertained.

6.    Fictitious Defendants F, G, H, I and J, are those corporations, partnerships, other business entities or other individuals who conspired with the named Defendants to further the conduct described in the complaint and/or who acted either independently or participated with others to commit the wrongful conduct complained of herein, whose name or names are

2

unknown to the Plaintiff at this time but which will be substituted by amendment when ascertained.

7.    All actions complained of herein took place in Montgomery County, Alabama.

8.    The Defendants have sufficient contacts with the State of Alabama and Montgomery County to allow jurisdiction and venue to be asserted over them by this Court. The policy of insurance at issue in this case was sold by the Defendants in Montgomery County, Alabama. Defendant Allstate has policies of insurance in full force and effect in Montgomery County, Alabama.    The claim at issue involves a house located in Montgomery County, Alabama.

9.    Plaintiffs bring this action solely under Alabama law.

10.    Certain of Plaintiff's factual and legal allegations are made in the alternative as allowed by the Alabama Rules of Civil Procedure.

## STATEMENT OF FACTS

11.    In 1999, the Plaintiff purchased a home. It was insured by Defendant Allstate. In consideration of the premium paid to it by the Plaintiff, Allstate issued a contract of homeowner's insurance, bearing policy number 0-95-571329-05/28, which was in full force and effect at the time of the loss at the insured premises at 2707 Woodley Ave., Montgomery, AL 36111-2836.

12.    The Plaintiff's contract of insurance extended coverage for her dwelling and personal property if her home was damaged by an insured peril.

13.    In September of 2004, the Plaintiff's home was damaged by a Hurricane Ivan wind. Wind is an insured peril under the policy. The Plaintiff called Defendant Allstate and reported the claim. Defendant David Oletski was initially assigned to the claim.

3

14.    The Plaintiff received estimates relating to the damage to her roof from independent contractors based in the Montgomery area. These contractors determined that her roof was damaged and needed to be replaced due to wind damage.

15.    The Defendants essentially denied the Plaintiff's claim, and did not pay her enough to have her roof repaired, instead only allowing a claim on the roof damage in the amount of $1842.41. The estimates to replace the roof by the Montgomery-area contractors were approximately $7500.

16.    After the loss and payment by Allstate, Ms. Via again requested that the Defendants pay her in full for her damage, but the Defendants failed and refused to pay the aforementioned damage, despite knowing that they were required to do so.

17.    Defendant Oertel was finally assigned to the claim. By this point, the Plaintiff had moved out of her home because mold had formed as a result of the moisture infiltration from the roof leak. Defendant Oertel again short changed the Plaintiff by failing to fully and adequately pay for the loss. Defendant Oertel had absolutely no basis for making such a determination. Likewise, the Defendants had no basis for the constructive denial of the claim.

18.    The Defendants were under an affirmative duty to pay Ms. Via the full value of her loss under her policy of homeowners insurance but failed to do so.

19.    Ms. Via purchased this insurance policy, and continued to pay premiums on the policy, upon the representations made by Allstate that they were in "Good Hands" with Allstate.

20.    After the storm, Ms. Via's home was severely damaged by wind. Her roof was a total loss from the wind damage. Despite clear evidence of the total loss of her roof and severe damage to her home, Allstate refused to fully compensate Ms. Via for her loss. Their refusal to pay was based upon the use of a fraudulent claims policy employed by Allstate on a nationwide

4

level. The claims policy is known as CCPR (Claims Core Process Redesign).

21.    The purpose of CCPR is not to ensure proper claims handling procedures by Allstate claims representatives. Rather, CCPR is designed to increase growth and profitability for Allstate Insurance Company at the policyholders' expense.

22.    Ms. Via, just like all other Allstate policyholders, never knew about Allstate's use of CCPR.

23.    At no time was Ms. Via aware of Allstate's use of the consulting firm, McKinsey & Company.

24.    Prior to her purchase of the insurance policy, Ms. Via, as well as all other Allstate policyholders, were unaware of McKinsey & Company's employment by Allstate and its role in reducing claims payments. Ms. Via was not aware of Allstate's radical new approach to claims handling - an approach that violates the traditional, legal definition of good faith and fair dealing. This fact was suppressed by Allstate when Ms. Via purchased the policy and during the period of payment of their premiums.

25.    Allstate Insurance Company makes every effort to conceal the presence of these documents from its policyholders. This fraudulent concealment is, in large part, a basis of the Plaintiffs' claim and is the reason why the Plaintiff was unaware of the institutional bad faith practices at Allstate.

26.    Like other Allstate policyholders, Ms. Via did not know that the CCPR process was being utilized in the handling of her property loss claim or that Allstate had test marketed the CCPR Roof Process in several neighborhoods across America. She did not know that Allstate redesigned its claim handling protocol to pit itself as an adversary against all its policyholders. They did not know of Allstate's expressly stated goal of the recapture of $475

5

million in yearly net income from the use of CCPR. This information and all other information about CCPR and its economic goals was suppressed from Ms. Via, the stockholders and the policyholders of Allstate Insurance Company.

27.    Allstate employed the CCPR Roof Process in the handling of her claim. By using CCPR, Allstate has a stated purpose of increasing growth and profitability, and increasing their competitiveness in the insurance industry. All of this is done at the expense of, and to the detriment of, policyholders such as Ms. Via.

28.    When she purchased the policy in question, and at all times thereafter, Allstate failed to inform Ms. Via that it had instituted a new claims procedure for handling claims, including roof claims. Since she live in an area of heavy and frequent storm involvement, they would not have purchased the policy had they known of this unlawful and unreasonable claims process for assessing hail and storm damage.

29.    Allstate's use of the CCPR Program is not made known to prospective policyholders before their purchase of an Allstate Homeowner's policy. Moreover, the CCPR Program is directly contrary to Allstate's representations to customers that they "are in Good Hands with Allstate."

30.    Allstate also owns Tech-Cor. This is a company utilized by Allstate to teach its adjusters how to underpay roof claims. Allstate, Tech-Cor and McKinsey & Company have all conspired to defraud Allstate policyholders, including Ms. Via, by suppressing the use of these processes from potential Allstate customers and Allstate policyholders. The processes are specifically designed to underpay claims and thus unjustly enrich Allstate Insurance Company by unlawfully increasing their profitability and growth.

31.    In an attempt to sell policies, trust and credibility to potential customers, Allstate

6

inundates the television, radio, magazines and newspapers with representations that policyholders of Allstate are "In Good Hands." These representations are directly contrary to Allstate's use of the Zero Sum Game in the claims handling process. This game represents Allstate's direct competition with its policyholders.

32.    Purchasing insurance is equivalent to purchasing a peace of mind. Allstate's new approach to claims handling ensures that policyholders will have anything but. More likely, an Allstate policyholder is destined to endure years of protracted litigation, mental anguish and time consuming, costly litigation.

33.    Ms. Via neither knew, nor could have known, of these secret claims handling procedures. She could not have known that these processes were responsible for dramatically increasing Allstate's profits at the expense of policyholders. They could not have known that Allstate planned for its redesign to result in an increase of between $375 million to $475 million per year in net income. Moreover, she could not have known that Allstate intended to use protracted and expensive litigation as a weapon against her and other policyholders in order to defeat the payment of her claim.

## INTRODUCTION TO CORE CLAIMS PROCESS REDESIGN

34.    Allstate Insurance Company, in an effort to increase its profitability and competitive standing in the insurance industry, created a radical new approach to claims handling. It was known as CCPR, or Core Claims Process Redesign. The express and stated purpose of CCPR was to increase growth and profitability, thus increasing Allstate's stock values.

35.    Core Claims Process Redesign was the brain child of Allstate's collaboration with McKinsey & Company.

7

36.    McKinsey & Company consults with Fortune 100 companies.    The purpose of their consulting work is to teach businesses how to increase their efficiency and profitability.

37.    This is a perfectly legitimate goal in American business circles.    However, when McKinsey's approach is applied to the insurance business, the final result is anything but legitimate.

38.    The implementation of CCPR was based upon McKinsey's use of Gaming Theory.

39.    According to this theory, a zero-sum game is a game in which one player's winnings equal the other player's losses.    Put another way, one party to a transaction must lose and one party must win.

40.    McKinsey & Company developed gaming strategies for competitive businesses which were very popular in the 1980's.    While the Zero Sum Game Theory has legitimate applications in the normal business world, it has no business in the world of insurance claims practices.

41.    Out of the gaming theory concept was born the Claims Core Process Redesign. According to McKinsey & Allstate, the new approach to claims handling would be that one party, the policyholder, must lose, and one party, the insurance company, must win.

42.    Under traditional insurance principles, the insurance company acts as the fiduciary and trustee for the policyholder.    In exchange for the payment of premium dollars from the policyholder, the insurer gives a promise to hold the funds in trust and pay all legitimate claims that arise.    If there is money left over in the trust fund after all claims are paid, then it belongs to the insurance carrier.

43.    As the fiduciary and trustee of the funds, the insurance company is not allowed to

8

act in a manner to maximize its profits at the expense of the insureds.  McKinsey & Company, using gaming theory, taught Allstate that, in order to maximize profits, Allstate would have to radically alter longstanding insurance principles and institute a "New Game."

44.    The collaboration between Allstate and McKinsey & Company began in 1992 and continued through 1997, with some final adjustments of the process during its implementation in key markets in 1997 and full-blown implementation in the national market in 1998.[1]

45.    This aggressive competition with its policyholders represents a radical departure from the underlying principles of insurance wherein the insurer is a trustee of funds for the policyholder and promises to pay all claims for benefits that arise under the policy of insurance.

46.    It is important to point out, right from the start, that senior Allstate management was fully behind the use of CCPR.

47.    The Homeowner Implementation Manual, along with the McKinsey Documents, also proves the existence of McKinsey & Company's involvement in the redesign of Allstate's claims practices.

48.    The overall results of CCPR for Allstate's bottom-line have been amazing. According to investor publications on Allstate's website, Allstate has seen an increase in profitability in the amount of $15 to $25 billion.  Allstate credits CCPR for this unprecedented and phenomenal growth.  Allstate does not tell its policyholders or shareholders what CCPR is or does.

49.    In terms of roof claims, Allstate determined that one of the largest areas of economic opportunity, outside of water claims, is in the area of wind and hail claims for roof

---

[1]    The CCPR process is used universally by Allstate for all adjusters in every market in the United States, including the Alabama market.

9

damage. Allstate enlisted the services of Tech-Cor, a company which Allstate owns, to assist Allstate in the calibration of its roof process.[2]

50.    The positive results for Allstate after the initial run of the Roof Process for CCPR was astonishing. The severity, or average amount paid for a certain type of claim, went down almost 50%. The number of CWP's, or Close Without Payment, increased by more than 50%. In other words, Allstate found that it could pay much less and close more files without any payment whatsoever.[3]

51.    Allstate makes every effort to conceal the use of CCPR from its customers. Allstate will only produce CCPR documents in litigation when there is a protective order. Allstate contends that such documentation constitutes trade secrets and that these documents are proprietary in nature. This documentation is not shared with Allstate policyholders either at the point of sale or at the time of the handling of a claim.

52.    Another disturbing characteristic of CCPR is Allstate's intent to use the American civil justice system to realize its goals. Allstate determined that aggressive litigation tactics would result in prohibitive litigation expenses which would, in turn, decrease the payout to the insured and send a clear message to the plaintiff's bar that litigating against Allstate makes it economically unfeasible to pursue claims any further.

53.    In a first-party claim, the policyholder is bringing a claim against Allstate. In a third-party situation, a person injured by a policyholder is making a claim. Obviously, the third-party claimant would be in an adversarial position with the insurer. However, Allstate treats the

---

[2] Calibration refers to the process by which Allstate ensures that all of its claims representatives, all across the country, are handling claims in the same manner.

[3] The initial test runs were in Albuquerque, New Mexico, Phoenix, Arizona, Denver, Colorado, and Dallas Texas.

first-party claimant, *i.e.*, the policyholder, exactly like they treat the adversarial claimant.

54.     The insurer is supposed to give equal consideration to the policyholder's interests as it does its own. Allstate is treating the policyholder as an adversary in every situation. This is the basis of the Zero Sum Game being played by Allstate and is the clearest possible evidence of an institutional practice of bad faith conduct at Allstate Insurance Company.

55.     Allstate also ties the performance of its adjusters to the amount of money that they pay out in claims. The less that they pay, the more that they receive in compensation from Allstate. This process is known at Allstate as "Paid to Evaluated."

56.     The "Paid to Evaluated" measurement was designed by McKinsey to ensure compliance among adjusters with the radical new approach to claims handling. This measurement was necessary because initial studies of CCPR determined that too many adjusters were still following the old claims protocols at Allstate which called for giving fair treatment to the policyholders.

57.     The method used to ensure compliance with the New Game of CCPR was to tie employment compensation to the average amount paid on claims by Allstate adjusters. This is the essence of "Paid to Evaluated."

58.     Another important change in policy by Allstate was SFXOL ("Settle for X or Litigate"). "X" was the value Allstate's new computer program, Colossus, placed on each claim. Adjusters were not allowed to exceed that fraudulent number. If they did, the "Paid to Evaluated" measurement tool would punish any adjusters whose settlement figures rose above the Colossus values. Incidentally, this was also a driving force in Allstate's insistence upon prohibitively expensive and aggressive litigation tactics as a means to lower claims payments.

59.     The success of this strategy is amply demonstrated in the financial performance of

11

Allstate since the implementation of CCPR. Their surplus increased from $4.62 billion in 1995 to $22.5 billion in 2005.

60.    "SFXOL" is the ultimate expression of Allstate's new game approach. Either defer to the insurance juggernaut with practically limitless resources or get hammered with the "Boxing Gloves" in litigation with aggressive litigation tactics. Or, as Allstate saw it, settle for our amount, "X," and get the "Good Hands."

61.    Ms. Via's claim was evaluated using CCPR. It is clear that Ms. Via was not getting the "Good Hands" but instead is getting the "Boxing Gloves."

<h3 style="text-align:center">COUNT ONE</h3>

<h3 style="text-align:center">BREACH OF CONTRACT</h3>

62.    The Plaintiff realleges all prior paragraphs as if set out fully herein.

63.    The insurance contract at issue imposed the duty on Allstate to adequately compensate its insureds for all damages that are covered by the terms or conditions of this policy.

64.    Notwithstanding the foregoing, the Defendant failed to promptly pay the balance due under Ms. Via's policy and breached the contract of insurance.

65.    Upon information and belief, the Defendant acted in a similar fashion in regard to hail and wind storm claims and property losses that occurred during the same period in Alabama and across the nation. (See Introduction to CCPR, herein above).

66.    As a direct result of Defendant's breach of the insurance contract, Ms. Via has been financially damaged and continues to suffer damage and loss. In addition, because of the Defendant's failure to honor its insurance contract, the Plaintiff and her daughter were forced to move out of their home and suffered health problems from the mold infestation in their home.

12

67.    The Plaintiff performed all matters and items properly required under the insurance policy as a condition precedent to this action or, alternatively, has been excused from performance by the acts, representations, and/or conduct of the Defendants which constitutes a waiver and/or estoppel of all such conditions precedent to recovery.

68.    As a further result of Defendants' breach of these insurance contracts, it has become necessary for Ms. Via to incur and become obligated for a reasonable attorney's fee and costs incurred for the prosecution of this case.

69.    The Plaintiff suffered property damage to her home. She was covered by a policy of homeowners insurance issued by Defendant Allstate. The Plaintiff gave timely notice of her property damage claim to the insurer.

70.    Without a proper investigation or justification, the Defendant refused to pay for the Plaintiff's property damage claim or failed to act seasonably on said claim.

71.    By failing to pay and properly investigate the Plaintiff's property damage claim, the Defendant breached the contract of insurance.

72.    The insurance contract at issue imposed the duty on Allstate to adequately compensate its insured, the Plaintiff, for all damages that are covered by the terms of conditions of the policy.

73.    The motive for the breach of contract was Allstate's use of CCPR and their stated intent to recapture $425 million per year in net income.

74.    As a proximate consequence of the breach of contract, the Plaintiff was injured mentally, emotionally, and financially.

13

## COUNT TWO

### BAD FAITH REFUSAL TO PAY A JUST CLAIM

75.    By placing its own financial interests above those of the policyholder, Allstate acted in a manner inconsistent with their "Goods Hands" policy and inconsistent with the implied covenant of good faith and fair dealing found within the policy of insurance.

76.    The Defendant's refusal to fully pay said claim was not based upon any reasonably legitimate, arguable, or debatable reason.

77.    When Allstate refused to fully pay said claim, it knew there was no legitimate, arguable, or debatable reason for doing so.

78.    The Defendant intentionally failed to determine whether or not there was any lawful basis for the refusal to fully pay said claim.

79.    The Defendant acted in bad faith in refusing to fully pay said claim and in failing to properly investigate the claim.

80.    The clear motive behind the bad faith denial of Ms. Via's claim, and all of the wrongful acts of Allstate, is to recapture $425 million per year in net income and increase the value of Allstate's stock.

81.    As a proximate consequence of the bad faith, the Plaintiff and her daughter were injured and damaged.

### COUNT THREE

### FRAUDULENT SUPPRESSION

82.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

83.    The Defendant had an affirmative duty to inform the Plaintiff of the employment of the consulting firm McKinsey & Company, the creation and results from CCPR, and of the involvement of Tech-Cor in the claims handling process.

84.    McKinsey & Company was employed by Allstate to assist them in unlawfully lowering claim indemnity costs, pendings and expenses.  In other words, McKinsey was hired to teach Allstate to pay less on claims, regardless of the merit of any individual claim and to identify economic opportunities in the claims handling process whereby Allstate and its adjusters could pay less on claims that should have been paid or were only partially paid.

85.    The result of the exploitation of the policyholders has been a $475 million increase in net income for Allstate as well as a profit of $25 billion.

86.    Allstate insureds, including Ms. Via, were never informed of this unlawful scheme and fraudulent conduct.  Had she known, Ms. Via would not have purchased the policy in question.

87.    The Defendant had an affirmative duty to inform the Plaintiffs that it employed the use of McKinsey's Zero Sum Game, CCPR, and the other fraudulent practices spawned by McKinsey's consulting services.  CCPR creates a clear conflict of interest between the insurer and the policyholder that does, and should not, exist under the original principles of insurance claims handling.

88.    Allstate, Oletski, and Oertel had an affirmative duty to inform Ms. Via about this conflict of interest.  She was not aware when she purchased the policy that CCPR and gaming theory was being used by Allstate in the handling of claims. Moreover, they were not informed of Allstate's intent to subjugate the judicial process to

their stated purpose of using aggressive litigation tactics to force the acceptance of lower claim payouts and to send a message to claimants that, if they chose full compensation, they would receive the "Boxing Gloves" rather than the "Good Hands."

89.    The Defendants, including Defendants Oletski and Oertel, also suppressed from the Plaintiff its use of the CCPR Program in the adjustment of this loss and in the adjustment of roof damage claims at Allstate.

90.    All of these suppressed facts were material facts which, if Ms. Via had known said facts, she would have purchased a policy of insurance from another insurer and would not have continued to pay premiums to Allstate.

91.    If policyholders were told that Allstate intended to use aggressive litigation tactics, redesign the claims process, and engage in an "Allstate must win, the policyholder must lose" claims philosophy, insureds such as the plaintiff, would not have purchased insurance through Allstate. No insured would intentionally purchase a lawsuit when they are seeking to purchase peace of mind and a transfer of risk in exchange for a premium.    Allstate suppressed the existence of CCPR, its goals and purposes of increasing profits at the expense of the trust fund created for the payment of claims, their collaboration with McKinsey and Tech-Cor, and other information stated in the above Statement of Facts that was material to the risk of Ms. Via's educated and informed purchase of insurance.

92.    The Defendant negligently, recklessly and/or intentionally suppressed this information from the Plaintiffs.

93.    As a proximate consequence of this fraudulent conduct, the Plaintiff was injured and damaged.

## COUNT FOUR

## BREACH OF FIDUCIARY DUTY

94.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

95.    Allstate Insurance Company represents to policyholders and potential policyholders that they are "In Good Hands with Allstate." This advertising campaign is designed to influence potential customers and create a feeling of trust and confidence in the insurance company.

96.    Ms. Via purchased this policy of homeowners insurance, in part, because of this marketing campaign. These advertisements inspired confidence in the Plaintiff that Allstate would act in good faith and in his interest during the handling of any potential claims that he might have under the policy of insurance.

97.    Ms. Via was unaware, at the time of the purchase of the policy, that Allstate engaged in the practice of employing a consulting firm for the express purpose of unreasonably and unlawfully lowering claim payments. She was also unaware of Allstate's use of the CCPR Program, the Zero Sum Game and the "Boxing Gloves" treatment that Allstate intended to use on first-party claimants who did not give in to Allstate's aggressive tactics.

98.    Ms. Via was also unaware that Allstate was using the judicial process to force the acceptance of lower claim payouts to policyholders. Allstate was using its superior financial position to foster aggressive litigation practices against all policyholders and claimants foolhardy enough to take on Allstate's billions in reserves. Allstate used the court system as a weapon to force claimants to accept lower benefits

17

which should have been paid under the policy and to send a clear message to the legal community.

99.    At all times during her purchase of this policy and during the claim process, Ms. Via, as average consumers unskilled in insurance matters, were in an inferior position of bargaining power. Allstate had knowledge vastly superior to his own about insurance matters and claims handling practices.

100.    Allstate took advantage of Ms. Via's inferior bargaining power and lack of knowledge about insurance industry terminology and practice.

101.    The Defendants Oletski and Oertel had a fiduciary duty to the Plaintiff to insure that her claim was handled properly and timely and was paid in accordance with the terms of their policy.

102.    The Defendants Allstate, Oletski, and Oertel had a fiduciary duty to the Plaintiff at all times as a result of her relationship as insured and insurer.

103.    Each of the Defendants breached this duty.

104.    As a proximate result, the Plaintiff were injured and damaged.

<u>COUNT FIVE</u>

<u>FRAUDULENT FAILURE TO PAY CLAIM</u>

105.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

106.    The Defendants fraudulently refused to fully pay the Plaintiffs' claim.

107.    The Defendants knew that the claim was the result of hail damage. Nonetheless, the Defendants concealed from the Plaintiffs the use of CCPR, the use of the McKinsey & Company consulting firm, the employment of Tech-Cor, the "Boxing

Gloves" treatment of first-party claimants and the huge profits that Allstate was making from underpaying policyholders.

108.    These material facts should have been disclosed to the Plaintiff and was not. These material facts were suppressed with the express intent to deceive the Plaintiff. This constitutes fraudulent conduct.

109.    As a proximate consequence of this deceitful and fraudulent conduct, the Plaintiff were injured and damaged.

## COUNT SIX

## CONSPIRACY

110.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

111.    The Defendant conspired with McKinsey and its adjusters Oletski and Oertel to create and implement the CCPR process and to conceal this material information from the public and its policyholders, as well as various state insurance commissioners.

112.    The Defendant Oletski and Oertel conspired with Allstate to improperly deny the Plaintiff's just claim for her own benefit, because incentives and rewards were offered to the Defendant Oletski and Oertel for the improper denial of the Plaintiff's claims.

113.    As a proximate consequence of this deceitful and fraudulent conduct, the Plaintiff were injured and damaged.

## COUNT SEVEN

## UNJUST ENRICHMENT

19

114.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

115.    Allstate Insurance Company has been unjustly enriched in the amount of approximately $425 million in net income per year since at least 1997. Allstate proudly proclaims surpluses of $25 billion and credits CCPR with the huge and unprecedented gain in profits.

116.    Allstate has been unjustly enriched by their fraudulent conduct. Hardworking policyholders have been deprived of premiums and subjected to Allstate's "Boxing Gloves" treatment. This conduct flies directly in the face of the entire premise of insurance; a promise for a premium. Allstate failed to keep that promise. They have been unjustly enriched as a result and should be required to disgorge these ill-gotten gains back into the hands of the policyholders that they took it from.

117.    Defendants Oletski and Oertel were unjustly enriched because of the rewards that were given to them for the improper denial of the Plaintiff's just claim.

118.    As a proximate result of Defendants' unjust enrichment, the Plaintiff has been injured.

## COUNT EIGHT
## NEGLIGENT AND/OR WANTON HIRING, TRAINING, AND/OR SUPERVISION

119.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

120.    Defendant Allstate negligently hired, trained, and/or supervised its agents and employees so that they were allowed to negligently and/or wantonly file and process the Plaintiff's claim.

121.    As a result of the Defendant's negligence and/or wantonness, the Plaintiff were injured and damaged as alleged above.

122.    To the extent that the Defendant's conduct was wanton, that conduct is such as to allow the imposition of punitive damages to punish this Defendant and to deter the others similarly situated from such conduct in the future.

## COUNT NINE
## BAD FAITH REFUSAL TO INVESTIGATE A CLAIM

123.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

124.    Defendants Oletski and Oertel and Allstate failed or refused to adequately investigate Plaintiff's just claim. There was no justifiable basis for this failure or refusal to investigate.

125.    Defendants Oletski, Oertel and Allstate committed bad faith in their failure or refusal to adequately investigate Plaintiff's claims.

126.    As a result of the Defendants' bad faith failure to investigate, the Plaintiff was injured and damaged as alleged above.

127.    To the extent that the Defendants' conduct was intentional and/or wanton, punitive damages are allowed to punish this Defendant and to deter others similarly situated from such conduct in the future.

## COUNT TEN
## NEGLIGENCE AND/OR WANTONNESS

128.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

129.    The Defendants Oletski and Oertel undertook a duty to properly and

completely adjust the Plaintiff's claim with Allstate.

130.    The Defendants negligently and/or wantonly failed to properly adjust the Plaintiff's claim and undervalued and/or underpaid her claim.

131.    As a result of the Defendants' negligence and/or wantonness, the Plaintiff was injured and damaged as alleged above.

132.    To the extent that the Defendants' conduct was intentional and/or wanton, punitive damages are allowed to punish this Defendant and to deter others similarly situated from such conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.  In such an amount of compensatory damages as will reasonably and adequately compensate them for their injuries and damages;

B.  In such an amount of punitive damages as will reflect the enormity of the wrongs committed by the Defendants and will deter the Defendants and others from committing similar wrongful acts in the future;

C.  Their costs in this action; and,

D.  Such other relief as this Court finds is appropriate.

_____
Christina D. Crow
Lynn W. Jinks, III
Attorneys for Plaintiff


OF COUNSEL:

JINKS, DANIEL & CROW, P.C.
Post Office Box 350
Union Springs, AL 36089
334-738-4225

FRANK M. WILSON, ESQ.
504 South Perry Street
Montgomery, Alabama 36104
(334)263-2560

## JURY DEMAND

PLAINTIFF HEREBY DEMAND TRIAL BY JURY ON ALL ISSUES OF THIS
CAUSE.

_____
OF COUNSEL