## IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

TONYA CHERYL MOSES,                    *
                                       *
        Plaintiff,                     *
                                       *
-vs-                                   *CIVIL       ACTION    NO.    CV-05- 447
                                       *
ALLSTATE INDEMNITY COMPANY,            *
EDDIE WATTS, DEXTER WALDEN,            *
fictitious defendants A, B, C, D, and E, *
being those persons, companies,        *
partnerships, or other entities who caused *
or contributed to cause the injuries and *
damages alleged herein through their   *
negligent and/or intentional conduct   *
and/or who are the successors in interest *
to any of the named Defendants and/or  *
who had supervisory control or the duty *
to supervise any of the named Defendants *
and F, G, H, I and J, said fictitious  *
defendants being those corporations,   *
partnerships, other business entities or *
other individuals who conspired with the *
named Defendants to further the conduct *
described in the complaint and/or who  *
acted either independently or participated*
with others to commit the wrongful     *
conduct complained of herein, whose    *
name or names are unknown to the       *
Plaintiff at this time but which will be *
substituted by amendment when          *
ascertained,                           *
                                       *
        Defendants.                    *

FILED IN OFFICE.
2005 NOV 14  PM 2: 43
CIRCUIT/DIST. COURT
RUSSELL CO. ALA.

### COMPLAINT

### STATEMENT OF THE PARTIES

1.      Plaintiff Tonya Cheryl Moses is an adult resident citizen of Russell County,

Alabama.

1



2.    Defendant Allstate Indemnity Company (hereinafter referred to as "Allstate") is a foreign corporation doing business in Russell County, Alabama.

3.    Defendant Eddie Watts is an adult resident citizen of Jefferson County, Alabama whose address for service is 2600 Corporate Drive, Birmingham, AL 35242.  At all times pertinent hereto, Defendant Watts was doing business in Russell County, Alabama and was acting as an agent or principal of the other named Defendants.

4.    Defendant Dexter Walden is an adult resident citizen of Russell County, Alabama whose address for service is 1418 14th Street, Phenix City, AL 36867.  At all times pertinent hereto, Defendant Walden was doing business in Russell County, Alabama and was acting as an agent or principal of the other named Defendants.

5.    Fictitious defendants A, B, C, D, and E are those persons, companies, partnerships, or other entities who caused or contributed to cause the injuries and damages alleged herein through her negligent and/or intentional conduct and/or who are the successors in interest to any of the named Defendants, and/or who had supervisory control or the duty to supervise any of the named Defendants whose names are not known to the Plaintiff at this time but which will be substituted by amendment when ascertained.

6.    Fictitious Defendants F, G, H, I and J, are those corporations, partnerships, other business entities or other individuals who conspired with the named Defendants to further the conduct described in the complaint and/or who acted either independently or participated with others to commit the wrongful conduct complained of herein, whose name or names are unknown to the Plaintiff at this time but which will be substituted by amendment when ascertained.

7.    All actions complained of herein took place in Russell County, Alabama.

2

8.    The Defendants have sufficient contacts with the State of Alabama and Russell County to allow jurisdiction and venue to be asserted over them by this Court. The policy of insurance at issue in this case was sold by the Defendants in Russell County, Alabama. Defendant Allstate has policies of insurance in full force and effect in Russell County, Alabama. The claim at issue involves a house located in Russell County, Alabama.

9.    Plaintiffs bring this action solely under Alabama law.

10.    Certain of Plaintiffs' factual and legal allegations are made in the alternative as allowed by the Alabama Rules of Civil Procedure.

## STATEMENT OF FACTS

11.    On or about February 18, 2004, the Plaintiff purchased a policy of insurance to insure her home from Defendant Allstate. Defendant Walden sold the policy of insurance to the Plaintiff. In consideration of the premium paid to it by the Plaintiff, Allstate issued a contract of homeowner's insurance, bearing policy number 9-15-205026-02/18, which was in full force and effect at the time of the loss at the insured premises at 601 14th Avenue South, Phenix City, Alabama 36869.

12.    The Plaintiff's contract of insurance extended coverage for her dwelling and personal property if her home was damaged by an insured peril.

13.    In September of 2004, the Plaintiff's home was damaged by Hurricane Ivan. Wind and hail damage are insured perils under the policy. The Plaintiff called Defendant Allstate and reported the claim. Defendant Watts was assigned as the adjuster to the claim.

14.    The Plaintiff received an estimate relating to the damage to her roof from independent roofing contractors based in the Russell County area. The contractor determined that her roof was damaged and needed to be replaced due to hail and/or wind damage.

3

15.     The Defendants essentially denied the Plaintiff's claim, contending that the damage was not related to hail or wind damage and allowing a claim on the roof damage in the amount of $506.37. The estimate to replace the roof by the Phenix City-area contractor was for $3,447.00 plus the cost of repairing the interior damage to the home.

16.     After the loss, the Plaintiff requested that the Defendants pay them in full for her damage, but the Defendants failed and refused to pay the aforementioned damage, despite knowing that they were required to do so.

17.     Defendants Watts denied the claim on the basis that there was no additional damage to the home and that the $506.37 was sufficient to cover all of the damage. Mr. Watts had absolutely no basis for making such a determination. Likewise, the Defendants had no basis for the denial of the claim.

18.     The Defendants were under an affirmative duty to pay the Plaintiff the full value of her loss under her policy of homeowners insurance but failed to do so.

19.     The Plaintiff purchased this insurance policy, and continued to pay premiums on the policy, upon the representations made by Allstate that they were in "Good Hands" with Allstate.

20.     After the storm, the Plaintiff's home was severely damaged by hail and wind. Her roof was a total loss from hail striking the roof and/or from wind damage. Despite clear evidence of the total loss of her roof and severe damage to her home, Allstate refused to fully compensate the Plaintiff for her loss. Its refusal to pay was based upon the use of a fraudulent claims policy employed by Allstate on a nationwide level. The claims policy is known as CCPR (Claims Core Process Redesign).

21.     The purpose of CCPR is not to ensure proper claims handling procedures by

4

Allstate claims representatives. Rather, CCPR is designed to increase growth and profitability for Allstate Insurance Company at the policyholders' expense.

22.    The Plaintiff, just like all other Allstate policyholders, never knew about Allstate's use of CCPR.

23.    At no time was the Plaintiff aware of Allstate's use of the consulting firm, McKinsey & Company.

24.    Prior to her purchase of the insurance policy, the Plaintiff, as well as all other Allstate policyholders, was unaware of McKinsey & Company's employment by Allstate and its role in reducing claims payments. The Plaintiff was not aware of Allstate's radical new approach to claims handling - an approach that violates the traditional, legal definition of good faith and fair dealing. This fact was suppressed by Allstate and Walden when the Plaintiff purchased the policy and during the period of payment of her premiums.

25.    Allstate Insurance Company and Walden make every effort to conceal the presence of these documents from its policyholders. This fraudulent concealment is, in large part, a basis of the Plaintiff's claim and is the reason why the Plaintiff was unaware of the institutional bad faith practices at Allstate.

26.    Like other Allstate policyholders, the Plaintiff did not know that the CCPR process was being utilized in the handling of her property loss claim or that Allstate had test marketed the CCPR Roof Process in several neighborhoods across America. They did not know that Allstate redesigned its claim handling protocol to pit itself as an adversary against all its policyholders. They did not know of Allstate's expressly stated goal of the recapture of $475 million in yearly net income from the use of CCPR. This information and all other information about CCPR and its economic goals were suppressed from the Plaintiff, the stockholders and the

5

policyholders of Allstate Insurance Company.

27.    Allstate employed the CCPR Roof Process in the handling of his claim. By using CCPR, Allstate has a stated purpose of increasing growth and profitability, and increasing her competitiveness in the insurance industry. All of this is done at the expense of, and to the detriment of, policyholders such as the Plaintiff.

28.    When she purchased the policy in question, and at all times thereafter, Allstate and Walden failed to inform the Plaintiff that Allstate had instituted a new claims procedure for handling claims, including roof claims. Since she lives in an area of heavy and frequent storm involvement, she would not have purchased the policy had she known of this unlawful and unreasonable claims process for assessing hail and storm damage.

29.    Allstate's use of the CCPR Program is not made known to prospective policyholders before their purchase of an Allstate Homeowner's policy. Moreover, the CCPR Program is directly contrary to Allstate's representations to customers that they "are in Good Hands with Allstate."

30.    Allstate also owns Tech-Cor. This is a company utilized by Allstate to teach its adjusters how to underpay roof claims. Allstate, Walden, Tech-Cor and McKinsey & Company have all conspired to defraud Allstate policyholders, including the Plaintiff, by suppressing the use of these processes from potential Allstate customers and Allstate policyholders. The processes are specifically designed to underpay claims and thus unjustly enrich Allstate Insurance Company by unlawfully increasing her profitability and growth.

31.    In an attempt to sell policies, trust and credibility to potential customers, Allstate inundates the television, radio, magazines and newspapers with representations that policyholders of Allstate are "In Good Hands." These representations are directly contrary to

6

Allstate's use of the Zero Sum Game in the claims handling process. This game represents Allstate's direct competition with its policyholders.

32.    Purchasing insurance is equivalent to purchasing a peace of mind. Allstate's new approach to claims handling ensures that policyholders will have anything but. More likely, an Allstate policyholder is destined to endure years of protracted litigation, mental anguish and time consuming, costly litigation.

33.    The Plaintiff neither knew, nor could have known, of these secret claims handling procedures. She could not have known that these processes were responsible for dramatically increasing Allstate's profits at the expense of policyholders. She could not have known that Allstate planned for its redesign to result in an increase of between $375 million to $475 million per year in net income. Moreover, she could not have known that Allstate intended to use protracted and expensive litigation as a weapon against them and other policyholders in order to defeat the payment of his claim.

## INTRODUCTION TO CORE CLAIMS PROCESS REDESIGN

34.    Allstate Insurance Company, in an effort to increase its profitability and competitive standing in the insurance industry, created a radical new approach to claims handling. It was known as CCPR, or Core Claims Process Redesign. The express and stated purpose of CCPR was to increase growth and profitability, thus increasing Allstate's stock values.

35.    Core Claims Process Redesign was the brain child of Allstate's collaboration with McKinsey & Company.

36.    McKinsey & Company consults with Fortune 100 companies. The purpose of their consulting work is to teach businesses how to increase their efficiency and profitability.

7

37.　This is a perfectly legitimate goal in American business circles. However, when McKinsey's approach is applied to the insurance business, the final result is anything but legitimate.

38.　The implementation of CCPR was based upon McKinsey's use of Gaming Theory.

39.　According to this theory, a zero-sum game is a game in which one player's winnings equal the other player's losses. Put another way, one party to a transaction must lose and one party must win.

40.　McKinsey & Company developed gaming strategies for competitive businesses which were very popular in the 1980's. While the Zero Sum Game Theory has legitimate applications in the normal business world, it has no business in the world of insurance claims practices.

41.　Out of the gaming theory concept was born the Claims Core Process Redesign. According to McKinsey & Allstate, the new approach to claims handling would be that one party, the policyholder, must lose, and one party, the insurance company, must win.

42.　Under traditional insurance principles, the insurance company acts as the fiduciary and trustee for the policyholder. In exchange for the payment of premium dollars from the policyholder, the insurer gives a promise to hold the funds in trust and pay all legitimate claims that arise. If there is money left over in the trust fund after all claims are paid, then it belongs to the insurance carrier.

43.　As the fiduciary and trustee of the funds, the insurance company is not allowed to act in a manner to maximize its profits at the expense of the insureds. McKinsey & Company, using gaming theory, taught Allstate that, in order to maximize profits, Allstate would have to

radically alter longstanding insurance principles and institute a "New Game."

44.     The collaboration between Allstate and McKinsey & Company began in 1992 and continued through 1997, with some final adjustments of the process during its implementation in key markets in 1997 and full-blown implementation in the national market in 1998.[1]

45.     This aggressive competition with its policyholders represents a radical departure from the underlying principles of insurance wherein the insurer is a trustee of funds for the policyholder and promises to pay all claims for benefits that arise under the policy of insurance.

46.     It is important to point out, right from the start, that senior Allstate management was fully behind the use of CCPR.

47.     The Homeowner Implementation Manual, along with the McKinsey Documents, also proves the existence of McKinsey & Company's involvement in the redesign of Allstate's claims practices.

48.     The overall results of CCPR for Allstate's bottom-line have been amazing. According to investor publications on Allstate's website, Allstate has seen an increase in profitability in the amount of $15 to $25 billion. Allstate credits CCPR for this unprecedented and phenomenal growth. Allstate does not tell its policyholders or shareholders what CCPR is or does.

49.     In terms of roof claims, Allstate determined that one of the largest areas of economic opportunity, outside of water claims, is in the area of wind and hail claims for roof damage. Allstate enlisted the services of Tech-Cor, a company which Allstate owns, to assist

_____

[1]   The CCPR process is used universally by Allstate for all adjusters in every market in the United States, including the Alabama market.

Allstate in the calibration of its roof process.[2]

50.    The positive results for Allstate after the initial run of the Roof Process for CCPR were astonishing. The severity, or average amount paid for a certain type of claim, went down almost 50%. The number of CWP's, or Close Without Payment, increased by more than 50%. In other words, Allstate found that it could pay much less and close more files without any payment whatsoever.[3]

51.    Allstate makes every effort to conceal the use of CCPR from its customers. Allstate will only produce CCPR documents in litigation when there is a protective order. Allstate contends that such documentation constitutes trade secrets and that these documents are proprietary in nature. This documentation is not shared with Allstate policyholders either at the point of sale or at the time of the handling of a claim.

52.    Another disturbing characteristic of CCPR is Allstate's intent to use the American civil justice system to realize its goals. Allstate determined that aggressive litigation tactics would result in prohibitive litigation expenses which would, in turn, decrease the payout to the insured and send a clear message to the plaintiff's bar that litigating against Allstate makes it economically unfeasible to pursue claims any further.

53.    In a first-party claim, the policyholder is bringing a claim against Allstate. In a third-party situation, a person injured by a policyholder is making a claim. Obviously, the third-party claimant would be in an adversarial position with the insurer. However, Allstate treats the first-party claimant, *i.e.*, the policyholder, exactly like they treat the adversarial claimant.

---

[2]  Calibration refers to the process by which Allstate ensures that all of its claims representatives, all across the country, are handling claims in the same manner.

[3]    The initial test runs were in Albuquerque, New Mexico, Phoenix, Arizona, Denver, Colorado, and Dallas Texas.

54.    The insurer is supposed to give equal consideration to the policyholder's interests as it does its own. Allstate is treating the policyholder as an adversary in every situation. This is the basis of the Zero Sum Game being played by Allstate and is the clearest possible evidence of an institutional practice of bad faith conduct at Allstate Insurance Company.

55.    Allstate also ties the performance of its adjusters to the amount of money that they pay out in claims. The less that they pay, the more that they receive in compensation from Allstate. This process is known at Allstate as "Paid to Evaluated."

56.    The "Paid to Evaluated" measurement was designed by McKinsey to ensure compliance among adjusters with the radical new approach to claims handling. This measurement was necessary because initial studies of CCPR determined that too many adjusters were still following the old claims protocols at Allstate which called for giving fair treatment to the policyholders.

57.    The method used to ensure compliance with the New Game of CCPR was to tie employment compensation to the average amount paid on claims by Allstate adjusters. This is the essence of "Paid to Evaluated."

58.    Another important change in policy by Allstate was SFXOL ("Settle for X or Litigate"). "X" was the value Allstate's new computer program, Colossus, placed on each claim. Adjusters were not allowed to exceed that fraudulent number. If they did, the "Paid to Evaluated" measurement tool would punish any adjusters whose settlement figures rose above the Colossus values. Incidentally, this was also a driving force in Allstate's insistence upon prohibitively expensive and aggressive litigation tactics as a means to lower claims payments.

59.    The success of this strategy is amply demonstrated in the financial performance of Allstate since the implementation of CCPR. Her surplus increased from $4.62 billion in 1995 to

11

$22.5 billion in 2005.

60.    "SFXOL" is the ultimate expression of Allstate's new game approach. Either defer to the insurance juggernaut with practically limitless resources or get hammered with the "Boxing Gloves" in litigation with aggressive litigation tactics. Or, as Allstate saw it, settle for our amount, "X," and get the "Good Hands."

61.    The Plaintiff's claim was evaluated using CCPR. It is clear that the Plaintiff is not getting the "Good Hands" but instead is getting the "Boxing Gloves."

## COUNT ONE

## BREACH OF CONTRACT

62.    The Plaintiff realleges all prior paragraphs as if set out fully herein.

63.    The insurance contract at issue imposed the duty on Allstate to adequately compensate its insureds for all damages that are covered by the terms or conditions of this policy.

64.    Notwithstanding the foregoing, the Defendant failed to promptly pay the balance due under the Plaintiff's policy and breached the contract of insurance.

65.    Upon information and belief, the Defendant acted in a similar fashion in regard to hail storm claims and property losses that occurred during the same period in Alabama and across the nation. (See Introduction to CCPR, herein above).

66.    As a direct result of Defendant's breach of the insurance contract, the Plaintiff has been financially damaged and continues to suffer damage and loss.

67.    The Plaintiff performed all matters and items properly required under the insurance policy as a condition precedent to this action or, alternatively, has been excused from performance by the acts, representations, and/or conduct of the Defendants which constitutes a

12

waiver and/or estoppel of all such conditions precedent to recovery.

68.    As a further result of Defendants' breach of these insurance contracts, it has become necessary for the Plaintiff to incur and become obligated for a reasonable attorney's fee and costs incurred for the prosecution of this case.

69.    The Plaintiff suffered property damage to the roof of her home. She was covered by a policy of homeowners insurance issued by Defendant Allstate. The Plaintiff gave timely notice of her property damage claim to the insurer.

70.    Without a proper investigation or justification, the Defendant refused to pay for the Plaintiff's property damage claim or failed to act seasonably on said claim.

71.    By failing to pay and properly investigate the Plaintiff's property damage claim, the Defendant breached the contract of insurance.

72.    The insurance contract at issue imposed the duty on Allstate to adequately compensate its insured, the Plaintiff, for all damages that are covered by the terms of conditions of the policy.

73.    The motive for the breach of contract was Allstate's use of CCPR and their stated intent to recapture $425 million per year in net income.

74.    As a proximate consequence of the breach of contract, the Plaintiff was injured mentally, emotionally, and financially.

## COUNT TWO

### BAD FAITH REFUSAL TO PAY A JUST CLAIM

75.    By placing its own financial interests above those of the policyholder, Allstate acted in a manner inconsistent with her "Goods Hands" policy and inconsistent with the implied covenant of good faith and fair dealing found within the policy of insurance.

76.    The Defendant's refusal to fully pay said claim was not based upon any reasonably legitimate, arguable, or debatable reason.

77.    When Allstate refused to fully pay said claim, it knew there was no legitimate, arguable, or debatable reason for doing so.

78.    The Defendant intentionally failed to determine whether or not there was any lawful basis for the refusal to fully pay said claim.

79.    The Defendant acted in bad faith in refusing to fully pay said claim and in failing to properly investigate the claim.

80.    The clear motive behind the bad faith denial of the Plaintiff's claim, and all of the wrongful acts of Allstate, is to recapture $425 million per year in net income and increase the value of Allstate's stock.

81.    As a proximate consequence of the bad faith, the Plaintiff was injured and damaged.

## COUNT THREE

### FRAUDULENT SUPPRESSION

82.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

14

83.    The Defendants Allstate and Walden had an affirmative duty to inform the Plaintiffs of the employment of the consulting firm McKinsey & Company, the creation and results from CCPR, and of the involvement of Tech-Cor in the claims handling process.

84.    McKinsey & Company was employed by Allstate to assist them in unlawfully lowering claim indemnity costs, pendings and expenses. In other words, McKinsey was hired to teach Allstate to pay less on claims, regardless of the merit of any individual claim and to identify economic opportunities in the claims handling process whereby Allstate and its adjusters could pay less on claims that should have been paid or were only partially paid.

85.    The result of the exploitation of the policyholders has been a $475 million increase in net income for Allstate as well as a profit of $25 billion.

86.    Allstate insureds, including the Plaintiff, were never informed of this unlawful scheme and fraudulent conduct. Had she known, the Plaintiff would not have purchased the policy in question.

87.    The Defendants Allstate and Walden had an affirmative duty to inform the Plaintiffs that it employed the use of McKinsey's Zero Sum Game, CCPR, and the other fraudulent practices spawned by McKinsey's consulting services. CCPR creates a clear conflict of interest between the insurer and the policyholder that does, and should not, exist under the original principles of insurance claims handling.

88.    Allstate, Walden, and Watts had an affirmative duty to inform the Plaintiff about this conflict of interest. She was not aware when she purchased the policy that CCPR and gaming theory was being used by Allstate in the handling of claims.

15

Moreover, they were not informed of Allstate's intent to subjugate the judicial process to her stated purpose of using aggressive litigation tactics to force the acceptance of lower claim payouts and to send a message to claimants that, if they chose full compensation, they would receive the "Boxing Gloves" rather than the "Good Hands." The Plaintiff would not have purchased the policy in question if she had known the true facts.

89.    The Defendants, including Defendant Watts, also suppressed from the Plaintiffs its use of the CCPR Program in the adjustment of this loss and in the adjustment of roof damage claims at Allstate.

90.    All of these suppressed facts were material facts which, if the Plaintiff had known said facts, she would have purchased a policy of insurance from another insurer and would not have continued to pay premiums to Allstate.

91.    If policyholders were told that Allstate intended to use aggressive litigation tactics, redesign the claims process, and engage in an "Allstate must win, the policyholder must lose" claims philosophy, insureds such as the plaintiffs, would not have purchased insurance through Allstate. No insured would intentionally purchase a lawsuit when they are seeking to purchase peace of mind and a transfer of risk in exchange for a premium. Allstate suppressed the existence of CCPR, its goals and purposes of increasing profits at the expense of the trust fund created for the payment of claims, her collaboration with McKinsey and Tech-Cor, and other information stated in the above Statement of Facts that was material to the risk of the Plaintiff's educated and informed purchase of insurance.

92.    The Defendant negligently, recklessly and/or intentionally suppressed this information from the Plaintiff.

16

93.    As a proximate consequence of this fraudulent conduct, the Plaintiff was injured and damaged.

COUNT FOUR

BREACH OF FIDUCIARY DUTY

94.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

95.    Allstate Insurance Company and its agents, including Defendant Walden, represent to policyholders and potential policyholders that they are "In Good Hands with Allstate." This advertising campaign is designed to influence potential customers and create a feeling of trust and confidence in the insurance company.

96.    The Plaintiff purchased this policy of homeowners insurance, in part, because of this marketing campaign. These advertisements inspired confidence in the Plaintiff that Allstate would act in good faith and in his interest during the handling of any potential claims that she might have under the policy of insurance.

97.    The Plaintiff was unaware, at the time of the purchase of the policy, that Allstate engaged in the practice of employing a consulting firm for the express purpose of unreasonably and unlawfully lowering claim payments. She was also unaware of Allstate's use of the CCPR Program, the Zero Sum Game and the "Boxing Gloves" treatment that Allstate intended to use on first-party claimants who did not give in to Allstate's aggressive tactics.

98.    The Plaintiff was also unaware that Allstate was using the judicial process to force the acceptance of lower claim payouts to policyholders. Allstate was using its superior financial position to foster aggressive litigation practices against all

17

policyholders and claimants foolhardy enough to take on Allstate's billions in reserves. Allstate used the court system as a weapon to force claimants to accept lower benefits which should have been paid under the policy and to send a clear message to the legal community.

99.    At all times during her purchase of this policy and during the claim process, the Plaintiff, as an average consumer unskilled in insurance matters, was in an inferior position of bargaining power. Allstate had knowledge vastly superior to the Plaintiff's own about insurance matters and claims handling practices.

100.    Allstate and Walden took advantage of the Plaintiff's inferior bargaining power and lack of knowledge about insurance industry terminology and practice.

101.    The Defendant Watts had a fiduciary duty to the Plaintiff to insure that her claim was handled properly and timely and was paid in accordance with the terms of her policy.

102.    The Defendants Allstate, Walden, and Watts had a fiduciary duty to the Plaintiff at all times as a result of her relationship as insured and insurer.

103.    Each of the Defendants breached this duty.

104.    As a proximate result, the Plaintiff was injured and damaged.

## COUNT FIVE

## FRAUDULENT FAILURE TO PAY CLAIM

105.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

106.    The Defendants fraudulently refused to fully pay the Plaintiff's claim.

107.    The Defendants knew that the claim was the result of hail and/or wind

18

damage. Nonetheless, the Defendants concealed from the Plaintiffs the use of CCPR, the use of the McKinsey & Company consulting firm, the employment of Tech-Cor, the "Boxing Gloves" treatment of first-party claimants and the huge profits that Allstate was making from underpaying policyholders.

108.    These material facts should have been disclosed to the Plaintiff and were not. These material facts were suppressed with the express intent to deceive the Plaintiff. This constitutes fraudulent conduct.

109.    As a proximate consequence of this deceitful and fraudulent conduct, the Plaintiff was injured and damaged.

## COUNT FIVE

## CONSPIRACY

110.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

111.    The Defendant Allstate conspired with McKinsey and its agents and adjusters, including Walden and Watts, to create and implement the CCPR process and to conceal this material information from the public and its policyholders, as well as various state insurance commissioners.

112.    The Defendant Watts and Allstate conspired to improperly deny the Plaintiff's just claim for their own benefit, because incentives and rewards were offered to the Defendant Watts for the improper denial of the Plaintiff's claims.

113.    As a proximate consequence of this deceitful and fraudulent conduct, the Plaintiff was injured and damaged.

## COUNT SIX

## UNJUST ENRICHMENT

114.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

115.    Allstate Insurance Company has been unjustly enriched in the amount of approximately $425 million in net income per year since at least 1997. Allstate proudly proclaims surpluses of $25 billion and credits CCPR with the huge and unprecedented gain in profits.

116.    Allstate has been unjustly enriched by her fraudulent conduct. Hardworking policyholders have been deprived of premiums and subjected to Allstate's "Boxing Gloves" treatment. This conduct flies directly in the face of the entire premise of insurance; a promise for a premium. Allstate failed to keep that promise. They have been unjustly enriched as a result and should be required to disgorge these ill-gotten gains back into the hands of the policyholders that they took it from.

117.    Defendant Watts was unjustly enriched because of the rewards that were given to him for the improper denial of the Plaintiff's just claim.

118.    As a proximate result of Defendants' unjust enrichment, the Plaintiff has been injured.

## COUNT SEVEN
## NEGLIGENT AND/OR WANTON HIRING, TRAINING, AND/OR SUPERVISION

119.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

120.    Defendant Allstate negligently hired, trained, and/or supervised its agents and employees so that they were allowed to negligently and/or wantonly suppress

material facts from the Plaintiff, as set forth above, and so that they were allowed to negligently and/or wantonly file and process the Plaintiff's claim.

121.    As a result of the Defendant's negligence and/or wantonness, the Plaintiff was injured and damaged as alleged above.

122.    To the extent that the Defendant's conduct was wanton, that conduct is such as to allow the imposition of punitive damages to punish this Defendant and to deter the others similarly situated from such conduct in the future.

**COUNT EIGHT**
**BAD FAITH REFUSAL TO INVESTIGATE A CLAIM**

123.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

124.    Defendants Watts and Allstate failed or refused to adequately investigate Plaintiff's just claim.    There was no justifiable basis for this failure or refusal to investigate.

125.    Defendants Watts and Allstate committed bad faith in their failure or refusal to adequately investigate Plaintiff's claims.

126.    As a result of the Defendants' bad faith failure to investigate, the Plaintiff was injured and damaged as alleged above.

127.    To the extent that the Defendants' conduct was intentional and/or wanton, punitive damages are allowed to punish these Defendants and to deter others similarly situated from such conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    In such an amount of compensatory damages as will reasonably and adequately compensate her for her injuries and damages;

B. In such an amount of punitive damages as will reflect the enormity of the wrongs committed by the Defendants and will deter the Defendants and others from committing similar wrongful acts in the future;

C.    Her costs in this action; and,

D.    Such other relief as this Court finds is appropriate.

_____
Christina D. Crow
Lynn W. Jinks, III
Nathan A. Dickson II
Attorneys for Plaintiff

OF COUNSEL:

JINKS, DANIEL & CROW, P.C.
Post Office Box 350
Union Springs, AL  36089
334-738-4225

JOSEPH G. STEWART, JR., P.C.
P. O. Box 911
Montgomery, AL  36101-0911
(334) 263-3552

**JURY DEMAND**

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

_____
OF COUNSEL

22

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| TONYA CHERYL MOSES, | * |
| | * |
| **Plaintiff,** | * |
| | * |
| -vs- | * CIVIL ACTION NO. 3:06CV154-DRB |
| | * |
| ALLSTATE INDEMNITY COMPANY, | * |
| EDDIE WATTS, DEXTER WALDEN, | * |
| | * |
| **Defendants.** | * |

### PLAINTIFF'S MOTION TO REMAND TO STATE COURT

COMES NOW the Plaintiff in the above styled cause and moves this Honorable Court to remand this action to state court pursuant to 28 U.S.C. §1447(c). The basis for the requested relief is that removal of this action to federal court is wrongful in that there does not exist complete diversity and the removal was filed improvidently. In support of this motion, the Plaintiff shows unto the court as follows:

1. The currently pending action involves allegations of negligence, wantonness, bad faith, breach of contract, fraudulent suppression, and fraudulent misrepresentations against Allstate Insurance Company, its local agent, Dexter Walden, and its adjuster, Eddie Watts.

2. Dexter Walden and Eddie Watts are admittedly Alabama residents. At all times pertinent hereto, all of the Defendants were doing business in Russell County, Alabama where the original lawsuit was filed.

3. The Defendant bases its attempt at removal on diversity of citizenship alleging that the Plaintiff fraudulently joined the resident Defendants, creating diversity jurisdiction for this Court.

4.    There is no question that the complaint states valid claims against Dexter Walden, Eddie Watts, and Allstate Insurance Company. There is similarly no question that the Plaintiff has not abandoned any claims against Eddie Watts or Dexter Walden.

5.    The Plaintiff does not deny that she is attempting to recover an amount greater than $75,000.00 against the Defendants in this action.

6.    In order to remove, given the presence of non-diverse defendants, Allstate must show there is no possibility that the Plaintiff can establish a cause of action against the local defendants in a pending action. There is no such proof in the Notice of Removal filed by the Defendants and, in fact, the evidence of record and the pleadings show that the Plaintiff does have several causes of action against Defendants Watts and Walden, that the facts of this case with regard to Defendant Walden's involvement with the Plaintiff's negotiations and purchase of homeowner's insurance from Walden and issued by Allstate are in dispute, that the facts relating to the incentives provided to Defendant Watts regarding the adjustment of claims are in dispute, and that the Plaintiff plans to pursue all legal and equitable remedies available to her against Defendants Walden and Watts.

7.    In addition, the Defendant's removal of this action was not timely filed pursuant to 28 U.S.C. §1446. The Defendant filed the removal 99 days after the complaint was filed, 97 days after service on the removing defendant, and 31 days after service of the discovery responses that the Defendant contends was the document that put it on notice of the removability of this action. Thus, the removal was untimely.

WHEREFORE, based upon the pleadings in the case, the brief of the Plaintiff and the attachments thereto, the Plaintiff requests that this case be immediately remanded to the Circuit Court of Russell County, Alabama so that it may be timely tried.

/s/ *Christina D. Crow*
CHRISTINA D. CROW
ATTORNEY FOR THE PLAINTIFF

OF COUNSEL:
JINKS, DANIEL & CROW , P.C.
P. O. BOX 350
UNION SPRINGS, AL 36089
(334) 738-4225

/s/ *Joseph G. Stewart*
JOSEPH G. STEWART
ATTORNEY FOR THE PLAINTIFF

OF COUNSEL:
JOSEPH G STEWART, ESQ.
POST OFFICE BOX 911
MONTGOMERY ALABAMA 36101-0911

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon the following by efiling a copy of the same on this 17th day of March, 2006:

Thomas E. Bazemore, III, Esq.
Gordon J. Brady, III, Esq.
Huie, Fernambucq & Strewart, LLP
The Protective Center
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223

/s/ *Christina D. Crow*
OF COUNSEL

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| TONYA CHERYL MOSES, | * |
| | * |
| Plaintiff, | * |
| | * |
| -vs- | * CIVIL ACTION NO. 3:06CV154-DRB |
| | * |
| ALLSTATE INDEMNITY COMPANY, | * |
| EDDIE WATTS, DEXTER WALDEN, | * |
| | * |
| Defendants. | * |

## PLAINTIFF'S BRIEF IN SUPPORT OF HER MOTION TO REMAND TO STATE COURT

COMES NOW the Plaintiff and in Response to the Notice of Removal filed herein by Defendant, Allstate, and in Support of her Motion to Remand, shows unto the Court as follows:

### ARGUMENT AND AUTHORITIES

Allstate argues that this case is removable because the non-diverse defendants have been fraudulently joined, claiming the plaintiffs have no viable claims against the non-diverse defendants. It also excuses its untimely removal by arguing that the responses to the requests for admission received, according to the Defendants, on January 21, 2006 established the removability of the action.

Even if plaintiff cannot establish arguable claims against the non-diverse defendants (which plaintiff argues it can), there were sufficient clues in the complaint for Allstate to intelligently determine that the case was removable when it was served and the thirty day time period for removal began then. Allstate's removal was not timely and remand should be granted. In addition, the Plaintiff has asserted viable claims against the non-diverse Defendants.

## A. Removal in General

Courts have noted that "[d]espite attempts to simplify it, removal practice is somewhat technical." *Weaver v. Miller Electric Manufacturing Co., Inc.*, 616 F.Supp. 683 (S.D. Ala.. 1985). In the recent case of *TKI, Inc. v. Nichols Research Corp.*, 191 F.Supp.2d 1307, 1309-1310 (M.D. Ala 2002), Chief Judge Albritton summarized the general law on removal:

> Federal courts are courts of limited jurisdiction. See *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Burns v. Windsor Insurance Co.*, 31 F.3d 1092, 1095 (1994); *Wymbs v. Republican State Executive Committee*, 719 F.2d 1072, 1076 (11th Cir.1983), cert. denied, 465 U.S. 1103, 104 S.Ct. 1600, 80 L.Ed.2d 131 (1984). As such, federal courts only have the power to hear cases that they have been authorized to hear by the Constitution or the Congress of the United States. See *Kokkonen*, 511 U.S. at 377, 114 S.Ct. 1673. **Because federal court jurisdiction is limited, the Eleventh Circuit favors remand of removed cases where federal jurisdiction is not absolutely clear.** See *Burns*, 31 F.3d at 1095.

*id.*, emphasis added.

Further,

> It is well-settled that a **defendant**, as the party removing an action to federal court, **has the burden to establish federal jurisdiction**. See *Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir.1996). **Removal statutes must be strictly construed** because of the significant federalism concerns raised by removal jurisdiction. See *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941); *Seroyer v. Pfizer, Inc.*, 991 F.Supp. 1308, 1312 (M.D.Ala.1997) (DeMent, J.). Therefore, **"[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."** 28 U.S.C. § 1447(c). **"All doubts [and uncertainties] about federal court jurisdiction must be resolved in favor of a remand to state court."** *Seroyer*,

991 F.Supp. at 1312 (citing *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir.1994)).

*Jeter v. Orkin Exterminating Co.*, 84 F.Supp.2d 1334, 1335-1336 (M.D. Ala 2000), emphasis added. See also: *Judson v. Nissan Motor Co.*, 52 F.Supp.2d 1352, 1356 (M.D.Ala. 1999); *Conference America, Inc. v. Q.E.D. Intern., Inc.*, 50 F.Supp.2d 1239, 1241 (M.D.Ala. 1999); *Steel Valley Author. v. Union Switch & Signal Div.* 809 F.2d 1006, 1010 (3d Cir. 1987), citing *Abels v. State Farm Fire & Casualty Company* 770 F.2d. 26, 29 (3d Cir. 1985) *cert. dismissed sub nom., American Standard v. Steel Valley Auth.*, 484 U.S. 1021, 108 S. Ct. 739, 98 L.Ed.2d 756 (1988); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir.1994) (citing *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108 (3rd Cir.1990); see also *Stone v. Williams*, 792 F.Supp. 749 (M.D.Ala .1992); *Seroyer v. Pfizer, Inc.*, 991 F.Supp. 1308, 1312 (M.D.Ala.1997).

The **burden** to demonstrate "that removal is jurisdictionally proper" is **a heavy one**, *Sanks v. Parke-Davis*, 2000 WL 33910097, *1 (M.D. Ala 2000), emphasis added, citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921), because "[i]t is to be **presumed that a cause lies outside** this limited [Federal] jurisdiction." *Sanks, supra,* emphasis added, citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).

When evaluating removal cases, the courts also hold that, generally speaking, the removal statutes must be construed narrowly. *Webster v. Dow United Technologies Composite Products, Inc.*, 925 F.Supp. 727, 729 (M.D.Ala., 1996) citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941).

With the context of these standards, the issues presented herein can be evaluated.

**B. Allstate's Removal Was Not Timely**

The procedure for removal is found in 28 U.S.C. § 1446. The time limits are set out in sub-section (b) as follows:

> (b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such

initial pleading has then been filed in court and is not
required to be served on the defendant, whichever period is
shorter. If the case stated by the initial pleading is not
removable, a notice of removal may be filed within thirty
days after receipt by the defendant, through service or
otherwise, of a copy of an amended pleading, motion, order
or other paper from which it may first be ascertained that
the case is one which is or has become removable, except
that a case may not be removed on the basis of jurisdiction
conferred by section 1332 of this title more than 1 year
after commencement of the action.

These time limits are not jurisdictional, but are mandatory, are strictly applied,
making remand proper when a petition for removal is not timely filed. *Webster v. Dow
Technologies, supra.*[1]

As shown above, there are two sentences in §1446(b). One provides that a case
must be removed within 30 days of receipt of the complaint or, in the case where the
initial pleading does not show that the case is removable, then the case must be removed
within 30 days after the defendant learns by receipt of pleadings or other papers, that it
should be removed. Thus, only

[w]hen the initial pleading fails to provide at least a clue
that the action is removable, [does] the thirty day period
does not begin. See *Richman v. Zimmer, Inc.*, 644 F.Supp.
540, 541 (S.D.Fla.1986).

*Naef v. Masonite Corp.*, 923 F.Supp. 1504, 1511 (S.D. Ala. 1996).

---

[1] "Thus, even though § 1446's time requirement is not jurisdictional, see, e.g., *Mackay v.
Uinta Development Co.*, 229 U.S. 173, 33 S.Ct. 638, 57 L.Ed. 1138 (1913); *Fristoe v.
Reynolds Metals Co.*, 615 F.2d 1209 (9th Cir.1980); *Leininger v. Leininger*, 705 F.2d 727
(5th Cir.1983), the time requirement is mandatory and must be strictly applied. See, e.g.,
*Northern Illinois Gas Co. v. Airco Industrial Gases*, 676 F.2d 270, 273 (7th Cir.1982);
*Shadley v. Miller*, 733 F.Supp. 54, 55 (E.D.Mich.1990); *Pillin's Place, Inc. v. Bank One,
Akron, N.A.*, 771 F.Supp. 205, 206 (N.D.Ohio 1991). Timely objection to a late petition
for removal will therefore result in remand. *St. Louis Home Insulators v. Burroughs
Corp.*, 597 F.Supp. 98, 99 (E.D.Mo.1984); accord *McCain v. Cahoj*, 794 F.Supp. 1061
(D.Kan.1992); *Flood v. Celin Jewelry, Inc.*, 775 F.Supp. 700 (S.D.N.Y.1991)." *Webster
v. Dow United Technologies Composite Products, Inc.*, 925 F.Supp. 727, 729 (M.D.Ala.,
1996).

Whenever the petition for removal is not filed within 30 days of service of the complaint, the first question is whether the complaint provided "at least a clue" that the cause was removable. If the initial pleading did not provide such a clue, then

> **. . . the thirty day time limit for notice of removal begins at the point when the defendant could have intelligently ascertained that the action was removable.** *Kuhn v. Brunswick Corp.*, 871 F.Supp. 1444, 1446 (N.D.Ga.1994). " '[T]he burden is on the defendant seeking removal to scrutinize the case and remove it in a timely fashion.' " *Id.* (quoting *Kaneshiro v. North Am. Co. for Life and Health Ins.*, 496 F.Supp. 452, 455-456, 462 (D.Haw.1980)). Therefore, in the action before this Court, **the Court must determine at what point Defendants could have intelligently ascertained that the action was removable through reasonable scrutiny of the pleadings and facts of the action as it developed in state court.**

*Naef v. Masonite Corp., supra*, 1511-1512, emphasis added.

The rule has been applied in this district. See *Clingan v. Celtic Life Ins. Co.*, 244 F. Supp. 2d 1298, 1302-1303 (D. Ala. 2003), *Webster v. Dow Technologies, supra*, 729; *Golden Apple Management Co. Inc. v. GEAC Computers*, 990 F.Supp 1364, 1366-1367 (M.D. Ala. 1998); *Webb v. Home Depot, USA, Inc.*, 2000 WL 351992 *2 (M.D. Ala. 2000).

Plaintiff filed her complaint on November 14, 2005 and Allstate was served on November 16, 2005. Allstate filed the Notice of Removal on February 21, 2006, over three months after the complaint was filed. Defendant claims that it only learned that the case was removable after receipt of the responses to the requests for admissions and that under the second sentence of §1446(b), its removal is timely. The Defendant admits receiving the responses to the requests for admissions on January 21, 2006, which was <u>31</u> days prior to the filing of the notice of removal.

In order to decide whether Allstate's removal was timely, the court must determine if the initial pleading provided a clue that the case was removable. If no such

clue was evident in the complaint, the court must then determine when Allstate could "have intelligently ascertained that the action was removable through reasonable scrutiny of the pleadings and facts" presented.

Plaintiff's claims against the non-diverse defendants involve four of the seven counts. Based on the fraudulent joinder arguments made in Allstate's notice of removal and assuming *arguendo* their validity, plaintiff's complaint provided a number of clues that the case was removable. The Defendant Allstate obviously thought that it was removable because it obtained the affidavits from Watts and Walden in December of 2005 (See Exhibit E to Defendant's Removal, Affidavit of Dexter Walden, dated December 14, 2005, and Exhibit D, affidavit of Eddie Watts, dated December 14, 2005). Thus, the only question is whether Allstate knew or should have known that the Plaintiff was claiming in excess of $75,000 upon the filing of her complaint. There was no attempt by the Plaintiff to limit her damages. The Plaintiff filed a 22 page complaint alleging Allstate committed company-wide wrongdoing and asking for compensatory and punitive damages. It is unbelievable that Allstate would argue that it did not know that the Plaintiff was claiming more than $75,000 before receiving the response to the request for admissions.

The court should review Allstate's arguments as well as the pleadings and depositions to determine when Allstate could have first intelligently ascertained that this case was removable. See *Clingan*, 244 F. Supp. 2d at 1302 and *Webster*, 925 F. Supp. at 729 ("A defendant can 'intelligently ascertain' notice of the requisites of removability from either formal or informal 'papers,'....") (citation omitted). Allstate must also use any information it may be charged with under the law in determining when a case first becomes removable. See, *e.g., Golden Apple*, 990 F. Supp. at 1368 ("A defendant cannot forgo one recognized means of obtaining information related to jurisdiction for another and then argue that the manner in which the information was provided ... precludes imputing knowledge of the information to the defendant. Such

manipulation would provide a windfall for the defendant which is clearly contravened by the removal statute's emphasis on effecting removal as soon as possible.")

In total, Allstate's principle argument on the timeliness of its removal is that it removed the case once it was able to intelligently ascertain that the Plaintiff was claiming in excess of the jurisdictional amount and that all claims against Watts and Walden should fail. As soon as it became aware of the removability of the case, Allstate states, it removed the case to this court without delay. The counter-argument to Allstate's position is that if it knew or could intelligently ascertain that all claims against Watts and Walden should fail at a time earlier than the date of the receipt of the responses to the discovery, the thirty day removal time limit began to run at that earlier time. If, for example, Allstate could have intelligently ascertained that all claims against Watts and Walden should fail after receiving the Complaint and that the Plaintiff was claiming in excess of the jurisdictional amount, Allstate may not remove this case after thirty days have passed. With that counter-argument in mind, the Court should revisit each of Plaintiff's claims against Watts and Walden to determine if and when Allstate could have first intelligently ascertained that all claims should fail.

The Plaintiff stated several counts under which punitive damages are allowed in her complaint, including bad faith and fraud based counts, along with wantonness. Under any calculation of damages, the Plaintiff's claims would potentially exceed the jurisdictional amount.

There were substantial "clues" available to Allstate at the time the complaint was served making this case very similar to *Naef v. Masonite Corp., supra*. There, the defendants removed more than thirty days after the complaint was filed, alleging fraudulent joinder. The court analyzed the arguments made by the defendant for fraudulent joinder in the context of whether the defendant could have intelligently ascertained that the action had become removable. For example, the defendant argued

that there was no privity on the breach of warranty claims.  Holding that the argument

had no substantive merit, the court stated:

> . . . even if Defendants' argument had merit, Defendants
> could have intelligently ascertained this argument by no
> later than May 25, 1995.  Viewing the evidence in a light
> most favorable to Plaintiffs, Defendants were aware of the
> privity argument as early as December 27 and 28, 1994, the
> date of service of the original Complaint. . . .

*id.* at. 1512.

The court then considered other arguments made by the defendant on fraudulent

joinder[2] and held that they all were clues by which the defendant should have determined

that removal jurisdiction existed long before the case was removed saying: "Defendants

were aware of all of these "clues" that this action was removable well before October 16,

1995."  *id.* at 1513.    Although the court held that the defendants had not been

fraudulently joined, it also stated that

> . . . even if this were a removable action, Defendants failed
> to file their Notice of Removal within thirty days of the
> date from which Defendants could intelligently ascertain
> that the action was removable as required by 28 U.S.C. §
> 1446.

*id.* at 1514.  See also *Kuhn v. Brunswick Corporation*, 871 F.Supp 1444 (N.D. Georgia,

1994)(failure to show citizenship of parties in complaint does not prevent the thirty day

removal period from commencing because "the burden is on the defendant seeking

removal to scrutinize the case and remove it in a timely fashion." at 1446, citing

*Kaneshiro v. North Am. Co. for Life and Health Ins.*, 496 F.Supp. 452, 455-456,

(D.Haw.1980)[3]).

---

[2]  These fraudulent joinder arguments included the fact that other like actions had been
filed in state court; a similar case had been decided; and the plaintiff's failure to add other
dealers to the action.

[3]  This is an application of the general rule that "[t]he burden is on the defendant seeking
removal to scrutinize the case and remove it in a timely fashion."  *Stokes v. Victory
Carriers, Inc.*, 577 F.Supp. 9, 11 (E.D. Pa. 1983); *Davis v. Baer*, 599 F.Supp. 776 (E.D.

Make no mistake, where the complaint fails to indicate or provide clues that the case is removable, then the case becomes removable thirty days after the defendant can intelligently ascertain removability. This determination may be made from settlement letters, *Golden Apple Management Co., Inc., v. GEAC Computers, Inc., supra*; from interrogatory answers, *Webster v. Dow Technologies, supra*; from deposition testimony, *Mallard v. Prudential Ins. Co.*, 1996 WL 170126 at *2 (M.D.Ala. Mar.29, 1996); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir.1996); *Brooks v. Solomon Co.*, 542 F.Supp. 1229, 1230 (N.D.Ala.1982); *Fuqua v. Gulf, Colo. & S. Ry.*, 206 F.Supp. 814, 815 (E.D.Okla.1962) as cited in *Golden Apple, supra*. However, if clues showing that the case is removable exist prior to a deposition, the deposition does not qualify as an "other paper" which would initiate the running of the thirty day time period to remove.[4] *Mallard v. Prudential Ins. Co. of America, supra*. at *2.

In the case at bar, the arguments for fraudulent joinder were known or could have been known had Allstate scrutinized the original Complaint filed against it. There was sufficient information in the complaint for Allstate to intelligently ascertain removability prior to the discovery responses. Instead, Allstate waited three months and until it had the discovery responses to use as an excuse for its failure to timely remove the case, and filed a notice of removal. Everything Allstate argues for fraudulent joinder could have been ascertained from the complaint and, while the plaintiff certainly disagrees that the

---

Pa. 1984); *Central Iowa Agri-Systems v. Old Heritage Advertising & Publishers Inc.*, 727 F.Supp. 1304, 1305 (S.D.Iowa 1989); *Turner v. Wilson Foods Corp.*, 711 F.Supp 624 (N.D. Ga 1989).

[4] In resolving the question of whether a deposition qualified as an "other paper" under the statute, the court stated: "Accordingly, the court holds that **so long as the defendants are not charged with knowledge of removability prior to the deposition date**, the deposition itself would qualify as an "other paper" as set forth in the statute, and removal would have been timely." *Mallard v. Prudential Ins. Co.*, 1996 WL 170126 at *2 (M.D.Ala. Mar.29, 1996), emphasis added.

case could have ever been properly removed, it certainly is not properly removed three months after filing of the action. Therefore, the case is due to be remanded.

## C. The Substantive Arguments

When the defendant fails to remove in an timely manner, the court need not address the substantive arguments.

> If a defendant does not comply with the thirty-day removal period set forth in § 1446(b), then the court does not need to address the substantive grounds for removal. See, e.g., *McHugh v. Physicians Health Plan of Greater St. Louis, Inc., et al.*, 953 F.Supp. 296, 297 (E.D.Mo.1997) ("The Court finds that defendants did not timely remove the plaintiff's class action petition to federal court. Because the case will be remanded to the state court, this Court will not consider the substantive ERISA arguments.")

*Link Telecommunications, Inc. v. Sapperstein*, 119 F.Supp.2d 536, 541-542 (D.Md. 2000)

However, Allstate has made substantive arguments, and plaintiff will address them.

## 1. Fraudulent Joinder in General

The "burden of persuasion placed upon those who cry 'fraudulent joinder' **is indeed a heavy one**." *B, Inc. v. Miller Brewing Company*, 663 F.2d 545 (5th Cir. 1981), emphasis added.

To establish fraudulent joinder, the removing party must show:

    (a)    that there is **no possibility** that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or

    (b)    that there has been outright fraud in the plaintiff's pleading of jurisdictional facts.

*B, Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. 1981) (emphasis in original); See also, *Keating v. Shell Chemical Company*, 610 F.2d 328 (5th Cir. 1980); *Tedder v. F.M.C. Corporation,* et al., 590 F.2d 115 (5th Cir. 1979); *Bobby Jones Garden Apartments v. Suleski*, 391 F.2d 172, 177 (5th Cir. 1968); *Parks v. New York Times Company*, 308 F.2d 474, 478 (5th Cir. 1962), cert denied, 376 U.S. 949, 84 S.Ct. 964, 11 L.Ed.2d 969 (1964).

In *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287, (11th Cir. 1998), the 11th Circuit added a third scenario:

> (c)   . . . where a diverse defendant is joined with a non-diverse defendant as to whom there is no joint, several or alternate liability and where the claim against the diverse defendant has no real connection to the claim against the non-diverse defendant.

*id.*, cites omitted, paragraph number added for clarity.

As in this case, the issue in most cases is whether the plaintiff can establish a cause of action against the named defendant in state court. There have been no allegations that there was fraud in the pleadings or that the non-diverse defendant has no liability or connection to the claim. Indeed, as agents for Allstate, Walden and Watts, the non-diverse Defendants, are intimately connected to the claim.

The standards by which a court evaluates the arguments for fraudulent joinder under are clear and of long standing:

> When determining whether a defendant was fraudulently joined, the court must evaluate all factual issues and substantive law **in favor of the plaintiff.** *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440 (11th Cir.1983), superceded by statute on other grounds as stated in *Georgetown Manor v. Ethan Allen,* 991 F.2d 1533 (11th Cir.1993). " **'If there is EVEN A POSSIBILITY that a state court would find that the complaint states a cause of action against ... the resident defendant[ ], the federal court must find that the joinder is proper and remand the case to the state court.'** The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate." *Triggs v. John Crump Toyota,* 154 F.3d 1284, 1287 (11th Cir.1998) (quoting *Coker*, 709 F.2d at 1440). "**The removing party bears the [heavy] burden of proving [by clear and convincing evidence] that the joinder of the resident defendant was fraudulent.**" *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir.1989) citing (*Coker*, 709 F.2d at 1440); see also *Crowe v. Coleman,* 113 F.3d 1536, 1538 (11th Cir.1997) (stating that "[t]he burden of the removing

party is a 'heavy one' "); *Parks v. New York Times*, 308
F.2d 474, 478 (5th Cir.1962) ("A claim that joinder is
fraudulent must be asserted with particularity and
supported by clear and convincing evidence."). Therefore,
the relevant issue is whether [the removing party] has
clearly shown that Plaintiff has failed to state any possible
claims under the laws of the State of Alabama for recovery
against [the alleged fraudulently joined defendant].

*id.*, bold and capitalizing added, footnote omitted.

Thus, if there is even a possibility that a state court would find that the complaint

states a cause of action against any one of the resident defendants, the federal court must

find that the joinder was proper and remand the case to the state court. *Coker v. Amoco

Oil Co*, 709 F.2d 1433, 1440-1441 (11th Cir. 1983), (citing *Parks v. New York Times Co.*,

308 F.2d at 477-78 (5th Cir. 1962)). Indeed, one court cites *Parks*[5] as holding that

> . . . there is fraudulent joinder only if the plaintiff fails to
> state a cause of action against the resident defendant and
> the failure is *obvious* according to the settled rules of the
> state.

*Jeter, supra*, at 1339, italics by the court.[6]

*Parks* also cites *McLeod v. Cities Service Gas Company*, 233 F.2d 242 (10th Cir.

1956) for the rule that fraudulent joinder must be supported by **clear and convincing**

**evidence** and **proven with certainty**. *Parks* at 478. When evaluating a claim of

---

[5] In so stating, *Parks* quoted Moore's Commentary on the United States Judicial Code,
Par. 0.03 (35), p. 234-236. *Parks* at 478.

[6] The *Parks* court also stated: "The joinder is fraudulent if it is clear that, under the law
of the state in which the action is brought, the facts asserted by the plaintiff as the basis
for the liability of the resident defendant could not possibly create such liability so that
the assertion of the cause of action is as a matter of local law plainly a sham and
frivolous. And a joinder is fraudulent if the facts asserted with respect to the resident
defendant are shown to be so clearly false as to demonstrate that no factual basis existed
for any honest belief on the part of plaintiff that there was joint liability." *Parks*, 308
F.2d at 477. (quoting *Morris v. E.I. Dupont de Nemours & Company*, 68 F.2d 788 (8th
Cir., 1934)).

fraudulent joinder, the federal court is not being called on to weigh the merits of the claim against the non-diverse plaintiff.

> . . . the jurisdictional inquiry "must not subsume substantive determination." *Id[7]*. at 550. Over and over again, we stress that "the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits." *Id.* at 548- 49. When considering a motion for remand, **federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law.** See *Id.* "**If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court.**" *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440-41 (11th Cir.1983), superseded by statute on other grounds as stated in *Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533 (11th Cir.1993). This consequence makes sense given the law that "absent fraudulent joinder, **plaintiff has the right to select the forum, to elect whether to sue joint tortfeasors and to prosecute his own suit** in his own way to a final determination." *Parks v. The New York Times Co.*, 308 F.2d 474, 478 (5th Cir.1962). **The strict construction of removal statutes also prevents "exposing the plaintiff to the possibility that he will win a final judgment in federal court, only to have it determined that the court lacked jurisdiction on removal,"** see *Cowart Iron Works, Inc. v. Phillips Constr. Co., Inc.*, 507 F.Supp. 740, 744 (S.D.Ga.1981) (quoting 14A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3721), a result that is costly not just for the plaintiff, but for all the parties and for society when the case must be relitigated.

*Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997), emphasis and footnote added.

The question before the court is whether Allstate has clearly and convincingly proven with certainty that under settled principals of state law, plaintiff obviously can

---

[7]  Reference is to *B, Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. Unit A 1981).

make no arguable claim at all against the non-diverse defendants. Allstate has not and cannot meet this heavy burden as it is required to do.

### 2. Fraudulent Suppression

There are two basic aspects of the fraudulent suppression count: (1) that Walden suppressed information about Allstate's philosophy relating to the adjustment of roof claims and (2) that Watts suppressed that he had financial incentives to recommend payment of a reduced claim amount.

Allstate argues that Watts and Walden cannot be guilty of suppression because he did not know the fact allegedly suppressed.

In Alabama, fraudulent suppression requires proof

> (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the suppression of that fact induced the plaintiff to act or refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result.

*Byrd v. Lamar*, 846 So. 2d 334, 348 (Ala. 2002)

Generally, "'[o]ne can be liable for suppression only of a fact of which one has knowledge.' *Brushwitz v. Ezell*, 757 So.2d 423, 432 (Ala.2000) (quoting *Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So.2d 1288, 1292 (Ala.1993))," *id.*   However, in the fraudulent joinder situation, the burden to prove that the agent had no knowledge remains a heavy one.

In *Wright v. American General Life and Acc. Ins. Co.*, 136 F.Supp.2d 1207 (M.D. Ala. 2001), the defendant argued that the resident agents had no knowledge of the facts allegedly suppressed.   Affidavits were filed in which agents swore they had no knowledge of different rates being charged whites and African-Americans and that they had no involvement in setting rates.   The Court held that for purposes of fraudulent joinder analysis, lack of knowledge had not been proven.

> The **question before this court, therefore, is whether this evidence is sufficient to establish that there is no possibility that a state court could find that a fraudulent suppression claim can be established** against the individual defendants.

*id.* at 1214

The court discussed the fraudulent joinder analysis rules from *Crowe v. Coleman*, 113 F.3d 1536 (11th Cir.1997), and stated:

> In *Crowe*, the Eleventh Circuit found that a conflict in facts between the defendant's affidavit and the Plaintiff's sworn complaint and statement of facts was sufficient to establish that there was no fraudulent joinder. *Id.* at 1542. **Another judge in this district has applied this rule in the context of a fraudulent suppression claim and determined that where a defendant submitted an affidavit wherein he stated that he had no knowledge of the fact suppressed, a question of fact was created by the allegations of the plaintiff's complaint that a conversation occurred during which the agent would have heard the relevant information, which the court concluded was sufficient to establish that there was no fraudulent joinder.** *Bedford v. Connecticut Mutual Life Ins. Co.*, 916 F.Supp. 1211 (M.D.Ala.1996).

*id.* at 1215

The *Wright* court found that, because the agents ran debit routes and established relationships with their customers, they could have learned about the difference in rates between African-Americans and whites, and held that it "cannot conclude that there is no possibility that a state court could not find that the Plaintiffs have established a claim against the resident defendants.[8]

---

[8] "The relevant fact which the Plaintiffs contend was suppressed in this case was "that African-American individuals were being charged more for industrial policies than similarly situated white individuals." Complaint at ¶ 51(a). The implication, of course, being that since the Defendants suppressed this fact, they had knowledge of it. American General has argued that the Plaintiffs are trying to hold the individual defendants liable on the basis of imputed knowledge that is foreclosed by Alabama case law. Such case law would not, however, foreclose a claim that the individual defendant who had knowledge

Likewise, in *Bedford v. Connecticut Mutual Life Ins. Co.*, 916 F.Supp. 1211 (M.D.Ala.1996), the plaintiff alleged that the resident agent suppressed facts upon which he relied. The company denied that the agent had such knowledge and filed his affidavit in which he denied discussing the insurance policy or representations made by others. The court held that the affidavit of the resident insurance agent defeated the fraudulent joinder claim by creating a fact issue.

> In light of the strong inference favoring the plaintiff's version of the facts, the court cannot and will not interpret disputed facts in favor of the defendant. **As such, the court presumes that a discussion between the, McCowns and the plaintiff did take place as alleged by the plaintiff, and thus, the McCowns did have knowledge of the alleged representations concerning the disputed whole life policy.**

*id.* at 1215-1216.

Allstate argues that Walden had no knowledge of any suppressed fact because he had nothing to do with claims and Watts had no knowledge because he did not work for Allstate but, instead, worked for an independent adjusting firm. The facts show that knowledge or lack thereof about claims has little to do with the alleged suppression.

However, this argument has also been addressed in the fraudulent joinder context:

---

of the fact suppressed that fact from the Plaintiffs. This case bears some similarity to the Bedford case wherein allegations in the complaint of a conversation during which knowledge could have been gained by the resident defendant was sufficient to establish that there was no fraudulent joinder. In this case, the Plaintiffs have alleged that individual agents formed personal relationships with policyholders and that the agents participated in "debit routes" whereby they personally visited the homes of policy owners on their routes to collect the premiums. Complaint at ¶ 13. The Plaintiffs have further alleged that disadvantaged persons, both African-American and white, were sold these policies. These allegations present a scenario through which the agents could learn, if not that actual rate structure of American General was based on race, then that there were differences between what white and African-American policyholders paid for their policies over time. Therefore, this court cannot conclude that there is no possibility that a state court could not find that the Plaintiffs have established a claim against the resident defendants." *Wright, supra* at 1215.

American General next argues that there can be no claim for fraudulent suppression because the policy itself revealed that the premiums could exceed the face amount of the policy. **Such an argument does not, however, address the contention that the agent failed to disclose the disparity in rates between white and black policy holders.**

*Wright v. American General Life and Acc. Ins. Co.*, *supra* at 1214

### 3. Breach of Fiduciary Duty

The Plaintiff claims that Walden and Watts had a fiduciary duty to her as the insurance salesman and the insurance claims adjuster to tell her the truth, including that Watts was paid incentives based upon his performance and the amount he paid for claims. Whether there was a fiduciary relationship and a breach of that relationship is a fact question which cannot be answered as a matter of law at this point. Thus, there is no fraudulent joinder of these defendants.

### 4.    Conspiracy and Unjust Enrichment

The Plaintiff claims that Walden and Watts conspired with Allstate to sell her a policy that would place her in "good hands" as represented in the advertisements but, instead, would insure that she would have a difficult, if not impossible, time to obtain proceeds under an insurance claim that was due and payable to her. Part of this conspiracy, and the resulting unjust enrichment, is that Watts was paid incentives based upon his performance and the amount he paid for claims. Whether there was a conspiracy and whether Watts was unjustly enriched as a result of that conspiracy is a fact question which cannot be answered as a matter of law at this point. Thus, there is no fraudulent joinder of these defendants.

### CONCLUSION

Allstate did not timely file its Notice of Removal. The Motion to Remand should be granted on that basis.

In addition, there are numerous claims against both resident defendants that have been made by Plaintiff. Allstate has not met its "heavy burden" of showing that there is no possible claim which could be made in state court against the resident defendants. Allstate's claim of fraudulent joinder fails. As such, this matter should be remanded to the Circuit Court of Russell County, Alabama, so that it may be timely tried.

/s/ *Christina D. Crow*
CHRISTINA D. CROW
ATTORNEY FOR THE PLAINTIFF

OF COUNSEL:
JINKS, DANIEL & CROW, P.C.
P. O. BOX 350
UNION SPRINGS, AL  36089
(334) 738-4225

/s/ *Joseph G. Stewart*
JOSEPH G. STEWART
ATTORNEY FOR THE PLAINTIFF

OF COUNSEL:
JOSEPH G STEWART, ESQ.
POST OFFICE BOX 911
MONTGOMERY ALABAMA 36101-0911

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon the following by efiling a copy of the same on this 17th day of March, 2006:

Thomas E. Bazemore, III, Esq.
Gordon J. Brady, III, Esq.
Huie, Fernambucq & Strewart, LLP
The Protective Center
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223

/s/ *Christina D. Crow*
OF COUNSEL